UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ACADIA INS. CO., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 08-11682-JLT |
| | * | |
| PEERLESS INS. CO., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

January 21, 2010

TAURO, J.

I.      Introduction

Plaintiff Acadia Insurance Company ("Acadia") brought this action in its own right and as

the assignee of its insured, Blackdog Builders, Inc. ("Blackdog"), seeking to recover damages

arising from an alleged breach of the duty to defend or indemnify Blackdog by Defendant Peerless

Insurance Company ("Peerless").[1]  This alleged breach stems from a lawsuit brought against

Blackdog by Colleen O'Neal ("O'Neal") for faulty work in the rehabilitation of her historic home.


Both parties now seek partial summary judgment on the claim that Peerless breached its

duty to defend Blackdog.  For the following reasons, Defendant's Motion for Partial Summary

Judgment on the Claim that Peerless Breached its Duty to Defend Blackdog [#26] is ALLOWED

and Plaintiff's Cross-Motion for Partial Summary Judgment on the Claim that Peerless Breached

its Duty to Defend Blackdog [#29] is DENIED.

---

[1]Compl. ¶¶ 15-16, 19-20.

II.     Background[2]

    A.      The Underlying Lawsuit

Colleen O'Neal purchased a historic home in Andover, Massachusetts, in October of 2000. On November 20, 2001, she contracted with Blackdog for extensive renovation and construction of a 3,000 square foot addition to the house. Unfortunately, O'Neal's relationship with Blackdog became problematic almost immediately and issues between the two eventually led O'Neal to terminate the contract with the renovations still uncompleted.

As detailed below, O'Neal filed suit against Blackdog shortly after terminating the contract.  The underlying complaint (the "O'Neal Complaint") alleged an array of damages that the parties do not dispute occurred entirely before Peerless succeeded Acadia as Blackdog's liability insurer.  The primary item of damages relevant to the current action relates to the shrinking, cracking, and separation of woodwork, including wainscoting[3] and trimwork, which Blackdog installed throughout the house "in 2004".[4]

Specifically, the O'Neal Complaint alleged that in June of 2002, "Blackdog's failure to protect the house against rain . . . and flooding in the basement which caused extensive damage to

_____

    [2]This court presents the facts in the light most favorable to Plaintiff, the party that does not prevail on summary judgment.  See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) ("[L]ike the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof."). The fact that there are cross-motions for summary judgment pending does not affect this court's assessment of the relevant facts.  Id.

    [3]Wooden panels used to line the walls of a room.

    [4]O'Neal Memorandum of Law in Support of Plaintiff's Motion to Confirm the Arbitration Decision, 3-4, attached as Ex. F to Def.'s Mot. Part. Sum. Judg. [hereinafter "Motion to Confirm Arbitration Decision"].

O'Neal's personal property stored in the basement," caused mold contamination[5] and damaged personal property, including the house's antique doors and wainscoting which Blackdog had disassembled and stored in the basement.[6] Blackdog reinstalled this woodworking in the residence in 2004.[7] But by late 2004, the woodworking had begun to visibly move, separate, and crack.[8]

The damage to the woodworking was first brought to Blackdog's attention in an email from O'Neal's construction representative, William Turville, to Blackdog's project manager in December of 2004.  Turville noted that things were cracking "everywhere," including wainscoting and "old millwork and doors."[9]  On April 14, 2005, O'Neal forwarded Blackdog a report from an expert which concluded that the woodwork had not been properly preconditioned by Blackdog to the appropriate moisture content, resulting in "excessive moisture [that] caused shrinking and cracking."[10]

Pursuant to the arbitration provision of the contract between O'Neal and Blackdog, the parties selected an independent construction professional to resolve the dispute that then existed as to the scope of the problems and the necessary repairs. The independent professional, David Dankens, issued a decision on January 12, 2006, in which he found that the "excessive

---

[5]Mediation Submission of Colleen O'Neal, 2, attached as Ex. 6 to Def.'s Statement of Material Facts [hereinafter "Mediation Submission"].

[6]See G.L. c. 93A Demand Letter, 13-14, attached as Ex. 4 to Def.'s Statement of Material Facts [hereinafter "93A Demand Letter"]; O'Neal Compl. ¶ 19.

[7]First Amended Complaint and Jury Demand, O'Neal v. Blackdog, Docket 06-cv-11152-JLT (D. Mass. May 8, 2007), ¶ 32 [hereinafter "O'Neal Compl."].

[8]Id.

[9]Motion to Confirm Arbitration Decision, 3-4.

[10]Id. at 4.

shrinkage in the pine trim stock and millwork resulting in the movement and cracking was
caused by exposure to excessive moisture during fabrication and installation coupled with
insufficient joinery connections and the extent, or lack of, priming."[11]  Dankens specifically
referenced both "new and original wainscoting and some original doors."[12] With regard to the
original wainscoting, he said that it "appears to have been subjected to excessive moisture while
in storage coupled with moisture present during the installation process."[13]  In his follow-up
report on January 20, 2006, Dankens confirmed that his "reference to existing millwork included
doors…though [his] suggested repairs targeted the wainscoting," which  "need[ed] to be
refabricated and shop primed by a competent millwork shop" because of exposure to excess
moisture.[14]

Blackdog's counsel responded to Dankens' conclusions regarding the necessity for and
scope of repairs by arguing that the repairs Dankens concluded "should have been done" were
premised on what "he would have done" rather than what the contract required.[15] Dankens
responded to this objection as follows:

"The builder is in control of the site. The builder must insure the existing finish materials
stored onsite are protected in a manner that damage will not occur during the construction
period. It is also the responsibility of the builder to inform the client of the risk associated

---

[11]Report of David Dankens, attached as Ex. I to Def.'s Mot. Part. Sum. Judg. [hereinafter
"Dankens Report"].

[12]Id.

[13]Id.

[14]Supplemental Report of David Dankens, Dated January 20, 2006, attached as Ex. K to
Def.'s Mot. for Part. Sum. Judg. [hereinafter "Supplemental Dankens Report"].

[15]Letter from Attorney Fidurko to Attorney Murphy, dated April 27, 2007, attached as Ex.
13 to Def.'s Statement of Material Facts.

with the onsite storage option. The client either accepts this risk after having been informed and the material remains onsite under the protection provided by the builder or the items are removed to a secure, off-site storage with additional cost assumed by the owner."[16]

When Blackdog refused to accept Dankens' recommendations, O'Neal filed a motion to confirm the arbitration decision as to the defective woodworking and necessary repairs referenced above.  O'Neal subsequently served a demand letter on Blackdog under Mass. G.L. c. 93A, and ultimately filed suit against Blackdog in Essex County Superior Court on June 6, 2006.[17]

Blackdog removed the action to this court and O'Neal filed the First Amended Complaint on May 8, 2007.  O'Neal alleged that Blackdog installed the wainscot system, woodwork, and trim throughout the house "in 2004", but did not allege that the installation had occurred on or before any specific date within that year.[18]  O'Neal further alleged that Dankens concluded the wainscot system "had not been installed properly by Blackdog" and required refabrication in a qualified millwork shop.[19]  Dankens "identified defects in other woodwork and trim and damages to the existing doors and woodwork which required repair for which Blackdog was responsible."[20]

B.    The Insurance Policies

Plaintiff Acadia insured Blackdog under a standard form Commercial General Liability

---

[16]Dankens Letter to Attorney Murphy and Attorney Consavage., attached as Ex. J to Def.'s Mot. Part. Sum. Judg.

[17]Digman Aff., ¶18.

[18]O'Neal Compl. ¶ 32.

[19]Id. ¶ 38.

[20]Id.

("CGL") Policy from the inception of the project that Blackdog undertook on O'Neal's Andover, Massachusetts, home in late 2001 until July 1, 2004.[21] Defendant Peerless succeeded Acadia as Blackdog's liability insurer on July 1, 2004, under a CGL policy with pertinent terms identical to those of the Acadia policy.[22]

The insuring clause of the CGL policy extends coverage to Blackdog for all sums that Blackdog should become liable to pay as damages because of "property damage caused by an occurrence" while the policy is in effect.[23] This property damage coverage is subject to a series of exclusions, collectively called the "Business Risk Exclusions", which operate together to preclude coverage for the insured's faulty workmanship.[24]  The rationale for such exclusions is that faulty workmanship is not an insurable "fortuitous event," but a "business risk"[25] to be borne by the insured and not the insurer.[26]

The umbrella term "business risk exclusions" encompasses exclusions (l), (m), and (j). Exclusions (l) and (m), which are not at issue in this action, eliminate coverage for the expense of

---

[21]Compl. ¶ 6.

[22]Aff. Of Michelle Digman ¶¶ 3-5, attached as Ex. 3 to Def.'s Statement of Material Facts [hereinafter "Digman Aff."].  Throughout the remainder of this memorandum, references to the "CGL policy" implicate the terms of both the Acadia and Peerless policies.

[23]Id.

[24]Id.

[25]David Dowd, Acadia's coverage counsel, took the position that "the defective workmanship" claims were not covered because of the "business risk" exclusions in his letter to O'Neal's counsel of June 23, 2006 (Ex. C).

[26]See, Couch on Insurance 3rd, § 129:11 (citing McAllister v. Peerless Ins. Co. 474 A.2d 1033 (N.H. 1984); Bond Bros., Inc. v. Robinson, 393 Mass. 546, 471 N.E.2d 1332 (1984).

6

restoring, repairing, or replacing the insured's defective work and the insured's satisfactory work

that was damaged by work that failed.[27] Of great relevance to this case, however, is Exclusion (j),

which excludes coverage for property damage to:

> (4) Personal property in the care, custody or control of the insured;
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced
>
> because your work was incorrectly performed on it.[28]

C.    Defense of the Lawsuit

As nearly all of the damages alleged in the O'Neal Complaint occurred prior to the

termination of Acadia's CGL policy, Acadia assumed the defense of the O'Neal lawsuit subject to

a  reservation of rights based in large part on the business risk exclusions contained in the CGL

policy.[29] On June 10, 2006, Blackdog filed a declaratory judgment petition against Acadia in

Rockingham County Superior Court in New Hampshire, seeking confirmation that Acadia's

policy afforded coverage to Blackdog for the damages alleged in the O'Neal lawsuit.[30] Acadia

answered the Petition on October 5, 2006, citing the "business risk" exclusions previously recited

in its reservation of rights as the basis for its counterclaim request for a declaration that its policy

---

[27]See Peerless Policy, attached as Ex. 3 to Def.'s Statement of Material Facts and Ex. A thereto [hereinafter "Peerless Policy"]; Reservation of Rights Letter.

[28]See Compl. ¶ 10; Peerless Policy.

[29]See Reservation of Rights Letter.

[30]Petition for Declaratory Judgment, Blackdog v. Acadia, Docket 06-E-0385 (N.H. July 20, 2006), attached as Ex. 15 to Def.'s Statement of Material Facts.

afforded no coverage for the O'Neal Complaint.[31]

In October of 2006, David Dowd, Acadia's coverage counsel, advised Peerless that he had been defending the O'Neal litigation since its inception under a reservation of rights in his role as Acadia's coverage counsel.[32] Dowd stated that Acadia had already paid O'Neal close to $250,000 to settle a property damage and loss-of-use claim resulting from flooding that occurred in 2002, but that O'Neal sought additional damages to new and existing woodwork in an estimated amount of $500,000.[33] Dowd indicated at the time that approximately $5,000 of that $500,000 claim related to damage to existing woodwork.  Acadia believed the damage to the woodwork alleged in the O'Neal complaint triggered coverage under Peerless' policy.[34]  By letter dated October 10, 2006, Dowd stated that:

> "Of particular interest for Peerless are assertions of damage to existent millwork and doors, etc., to which the complaint seems to date to 2005…whereas the complaint states or adumbrates the claim of property damage during Peerless' time on the risk and the possibility of coverage has not been precluded by the allegations. Peerless should bear the burden and expense of defense with my client, Acadia."[35]

Following receipt of Attorney Dowd's letter, Peerless's counsel, Andrew Dunn, contacted Blackdog's counsel, Gordon Rehnborg, to request a list of damages that Blackdog may have

---

[31]Def. Acadia's Answer to Petition for Declaratory Judgment and Def.'s Counterclaim, <u>Blackdog v. Acadia</u>, Docket 06-E-0385 (N.H. July 20, 2006), attached as Ex. 16 to Def.'s Statement of Material Facts.

[32]Digman Aff., ¶ 18.

[33]<u>Id.</u>

[34]<u>See</u> Attorney Dowd's Letter to Peerless, dated October 10, 2006, attached as Ex. 8 to Def.'s Statement of Material Facts; Attorney Dowd's Letter to Attorney Dunn, dated April 20, 2007, attached as Ex. 9 to Def.'s Statement of Material Facts.

[35]Attorney Dowd's Letter to Peerless, dated October 10, 2006, attached as Ex. 8 to Def.'s Statement of Material Facts.

caused to O'Neal's property during Peerless's coverage period.  On January 11, 2008, Attorney

Rehnborg, replied letter to Attorney Dunn by letter, alerting Dunn to the declaratory judgment

action pending against Acadia and describing an array of problems that O'Neal claimed had

occurred after July 1, 2004.[36]  Attorney Rehnborg's letter mentioned problems with the plumbing,

including damage caused to an existing plumbing line by a subcontractor.  He also described

problems with the HVAC system and stated that faulty work on the HVAC system had allowed

insects to enter the house.  Additionally, he noted that a leak in the house's roof at the chimney

had caused damages beginning in 2004 and O'Neal began experiencing water intrusion in her

garage in February 2005.  Lastly, Attorney Rehnborg stated that Blackdog or a subcontractor had

improperly performed a portion of the floor finishing and painting.

     None of the damages that Attorney Rehnborg detailed in his letter, except for the damage

to the plumbing pipe, were referenced in the O'Neal complaint or in any other pleadings or

documents prepared by O'Neal or her counsel in the prosecution of her case against Blackdog.[37]

The damage to the pipe is referenced only in the Mass. G.L. c. 93A letter generated prior to the

O'Neal Complaint and without a specific allegation as to the date that it occurred.[38]

     On February 11, 2008, Acadia moved to add Peerless as a party to the declaratory

judgment action filed by Blackdog against Acadia in Rockingham County Superior Court.   But

Peerless successfully moved to dismiss the Petition against it due to tardy filing.

     In his letter of January 11, 2008, Attorney Rehnborg had alerted Peerless that Blackdog

---

[36]See Attorney Rehnborg's Letter to Attorney Dunn, dated January 11, 2008, attached as
Ex. A to Pl.'s Cross-Mot. Part. Sum. Judg. [hereinafter "Rehnborg Letter"].

[37]See Def.'s Objection to Pl.'s Statement of Material Facts, ¶¶ 11-21.

[38]Id.

and Acadia intended to resolve the O'Neal litigation through mediation and stated his "hope that Peerless would also have an interest in participating either directly or indirectly in mediation in an effort to resolve this case and avoid future litigation."[39]  In May of 2008, however, Blackdog, Acadia, and O'Neal participated in mediation without the participation of Peerless.  At mediation, O'Neal's counsel presented estimates and bills for the repair of the millwork totaling $188,557.[40] The mediation resulted in a settlement and a payment to O'Neal of $400,000, of which Blackdog paid $300,000 and Acadia paid $100,000.  As part of the settlement, Blackdog assigned any outstanding rights against Peerless to Acadia.

III.   Discussion

Defendant Peerless is entitled to partial summary judgment on the issue of whether it breached its duty to defend Blackdog because exclusion (j), subparts (4), (5), and (6), all apply to preclude the relevant damages in the O'Neal Complaint from coverage under the Peerless policy. Furthermore, were this court to assume that the O'Neal Complaint indeed alleged covered property damage, Peerless's duty to defend Blackdog never arose because Blackdog did not tender the defense of the claim to Peerless.

A.   Summary Judgment

Pursuant to Fed. Rule of Civ. Pro. 56(a), summary judgment shall be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

---

[39]Rehnborg Letter, at 3.

[40]Plaintiff's Summary of Damages, attached as Ex. 6 to Def.'s Statement of Material Facts, Ex. D thereto.  Less than ten percent of these repair costs related to the repair of old wainscoting and antique doors that were part of the original structure and which had been disassembled and stored in the basement at the time of the flood in 2002, then reinstalled in 2004. The vast majority of these repair costs related to new millwork built on-site by Blackdog. Breakdown of Millwork Damages, attached as Ex. 10 to Def.'s Statement of Material Facts.

of law.[41]  In granting a summary judgment motion, the court "must scrutinize the record in the

light most favorable to the summary judgment loser and draw all reasonable inferences therefrom

to that party's behoof."[42] Where, as here, the court is presented with cross-motions for summary

judgment, it "must consider each motion separately, drawing inferences against each movant in

turn."[43]

The parties to this action do not dispute the material facts relevant to the issue of Peerless'

duty to defend Blackdog in the O'Neal construction defect litigation and, therefore, this court

finds it appropriate to dispose of the issue as a matter of law.

B.      Choice of Law

This court, acting under diversity jurisdiction, must apply the choice-of-law rules of the

forum state.[44]  Under the Massachusetts choice-of-law rules relevant to a dispute arising out of an

insurance policy, this court must apply the law of the state that has the most significant

relationship to the insurance contract at issue.[45] In this case, the court is asked to determine a

New Hampshire insurer's duty to defend a New Hampshire insured under a policy issued and

delivered in New Hampshire and covering predominantly New Hampshire risks.[46]  The law of

---

[41]Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008).

[42]Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

[43]Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 6-7 (1st Cir. 1998)
(quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)).

[44]Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997).

[45]Bushkin Assoc., Inc. v. Raytheon Co., 393 Mass. 622, 628 (1985).

[46]See Decl. of Peerless Policy, Def.'s Mem. Mot. Part. Sum. Judg., Ex. C, Ex. B thereto.

New Hampshire, therefore, applies to the construction and interpretation of the Peerless policy.[47]

C.      New Hampshire Insurance Law

"The interpretation of the language of an insurance policy, like any contract language, is ultimately an issue for the court to decide."[48]  The court will construe the language of an insurance contract as would a reasonable person in the position of the insured and will enforce a provision that limits coverage under the policy only when the provision's language is clear and unambiguous.[49]

Under New Hampshire law, "an insurer's obligation to defend its insured is determined by whether the cause of action against the insured alleges sufficient facts in the pleadings to bring it within the express terms of the policy."[50]  Any doubt as to whether the complaint against the insured alleges a liability of the insurer under the policy must be resolved in the insured's favor.[51]

> "An insurer's obligation is not merely to defend in cases of perfect declarations, but also in cases where by any reasonable intendment of the pleadings liability of the insured can be inferred, and neither ambiguity nor inconsistency in the underlying plaintiff's complaint can justify escape of the insurer from its obligation to defend."[52]

A liability insurer, therefore, has a duty to defend an entire action if any claims raised by

---

[47]Importantly, the parties agree that New Hampshire law applies to this insurance coverage dispute.

[48]Merchs. Mut. Ins. Co. v. Laighton Homes, LLC, 153 N.H. 485, 487 (2006) (internal citation omitted).

[49]Id.

[50]Webster v. Acadia Ins. Co., 156 N.H. 317, 319 (2007) (citing Broom v. Continental Cas. Co., 152 N.H. 749, 753 (2005)).

[51]Id.

[52]Id.

the complaint are potentially covered under the policy, even when the potentially covered claims are merely peripheral to the litigation.[53] The insurer bears the burden of establishing that the claim falls entirely outside the scope of coverage.[54]  An insurer must defend its insured when the allegations of the underlying complaint do not unequivocally preclude coverage, but it may withdraw if subsequent discovery or pleadings demonstrate that the claims seek recovery outside the policy's coverage.[55]

   To determine the scope of coverage the court begins by comparing the policy language with the facts alleged in the complaint.[56]  If the complaint in the underlying action does not clearly preclude coverage on its face, the court may look beyond the pleadings to facts known or readily knowable by the insurer *at the time of the complaint* to determine whether the complaint indeed triggered an insurer's duty to defend.[57]  Importantly, the mandate that the court begin by analyzing only the allegations of the complaint and the language of the policy suggests to this court that extrinsic facts are to be used sparingly, only as an aid to interpretation of the facts alleged in the complaint, and not as independent predicates for a duty to defend.[58]

   Plaintiff contends that the O'Neal Complaint was ambiguous with respect to the time

---

[53]Titan Holdings Syndicate, Inc. v. The City of Keene, 898 F.2d 265, 269 (1st Cir. 1990).

[54]U.S.Fidelity & Guar. Co., Inc. v. Johnson Shoes, Inc., 123 N.H. 148, 153 (1983).

[55]Broom v. Continental Casualty Co., 152 N.H. 749, 753 (2005).

[56]Id. at 271.

[57]Insight Tech. Inc. v. Wausau Bus. Ins. Co., 2005 U.S. Dist. LEXIS 38708, at *9 (D.N.H. 2005) (quoting Open Software Found., Inc. V. U.S. Fidelity and Guar. Co., 307 F.3d 11, 15 (1st Cir. 2002)).

[58]See Open Software Found., Inc., 307 F.3d at 15 (applying Massachusetts law).

frame during which certain carpentry work was performed and, therefore, leaves open the possibility that covered property damage to antique wainscoting and doors occurred during Defendant's coverage period. Plaintiff further submits that the O'Neal complaint could have intended to make claims against Blackdog for damages other than that to the woodwork, which would potentially fall within the coverage of the Peerless policy. In support of this contention, however, Plaintiff cites to no references to such other damages contained in the O'Neal pleadings or any other document produced by O'Neal or her counsel in the prosecution of her case against Blackdog. Plaintiff instead relies on a letter sent to Defendant's coverage counsel by Blackdog's counsel, Attorney Rehnborg, eight months after the First Amended O'Neal Complaint was filed. This letter detailed problems with the plumbing and the HVAC system that were allegedly caused by subcontractors after Peerless' policy took effect.[59]

Significantly, however, with the exception of a single reference to a damaged plumbing pipe in the Mass. G.L. c. 93A Demand Letter, none of the damages described by Attorney Rehnborg appear in the O'Neal Complaint, in any of the demands prepared prior to that litigation, or in the damage compilations and mediation statement, which set the framework for the ultimate settlement between O'Neal, Blackdog, and Acadia. As Plaintiff points out, New Hampshire law allows the court to look beyond the complaint to determine whether an insurer has a duty to defend a claim when the facts alleged in the complaint do not conclusively preclude coverage. Once this rule is invoked, however, the court may only turn to additional facts known or readily knowable to the insurer *at the time of the complaint* to establish whether coverage for the claim

---

[59]See Letter o Pl. Cross-Mot. Part. Sum. Judg., 3, and Ex. A thereto.

exists under the policy.[60]

Even assuming, as Plaintiff suggests, that the language of the O'Neal complaint does not conclusively preclude coverage under the Peerless policy, the parties have presented no evidence to suggest that Defendant knew or should have known of the other damages alleged to have occurred after the inception of Defendant's policy by Attorney Rehnborg at the time that O'Neal filed the complaint in the underlying action.  The O'Neal Complaint does not contain even ambiguous references to the types of damages detailed by Attorney Rehnborg's letter that might induce the court to look to extrinsic facts for further guidance on the issue.  And even if it did, this court questions whether a document created eight months after the filing of the First Amended Complaint would be the proper source from which to draw the extrinsic facts necessary to elucidate the contents of the complaint itself.

It cannot reasonably be said, under the circumstances, that Attorney Rehnborg's letter aids the court in interpreting the facts alleged in the complaint.  Rather, Plaintiff would have this court use the extrinsic facts in Attorney Rehnborg's letter as independent predicates establishing a duty to defend.  This court may not properly rely on the letter in this manner[61] and, therefore, will not consider the damages set forth by Attorney Rehnborg's letter in determining whether Defendant Peerless had a duty to defend Blackdog in the O'Neal litigation.

At oral argument, Plaintiff also attempted to argue that general references to "damage" in the O'Neal Complaint[62] sufficed to invoke Defendant's duty to defend.  As explained further

---

[60]<u>Insight Tech. Inc.</u>, 2005 U.S. Dist. LEXIS 38708, at *9 (internal citation omitted).

[61]<u>See</u> <u>Open Software Found., Inc.</u>, 307 F.3d at 15 (applying Massachusetts law).

[62]<u>See, e.g.</u>, O'Neal Compl., ¶ 59 ("Blackdog was negligent in the course of performing its work, resulting in defective work and damage to the plaintiff's property.").

below, the CGL policy covers property damage caused by an occurrence other than the insured's

defective workmanship.  Thus, Plaintiff argues, the fact that O'Neal alleged both defective

workmanship *and* property damage, combined with the fact that Peerless provided liability

insurance to Blackdog for a portion of the O'Neal project, raises sufficient doubt as to whether

the complaint alleged property damage covered under Peerless's policy to trigger its duty to

defend.

The relevant question, however, is not whether the complaint successfully alleged property

damage covered under any liability insurance policy.  Undoubtedly, it did, as evidenced by

Acadia's defense of the O'Neal action.  Rather, the relevant question is whether the O'Neal

Complaint alleged property damage covered under *Peerless's* policy.  And the complaint's

general allegations of "damage", to which Plaintiff points, cannot answer this question.  In order

to give meaning to the word "damage", this court necessarily must turn to the specific property

damages alleged elsewhere in the complaint.  This, in turn, brings the analysis full circle to the

allegations of damage to the woodworking and plumbing pipe, the only damages alleged to have

occurred after July 1, 2004, when Peerless's policy took effect.

Because the damages to the woodworking and the plumbing pipe are the only damages

alleged anywhere in the O'Neal pleadings that potentially fall within Defendant's coverage period

and, therefore, potentially invoke Defendant's duty to defend the O'Neal action, they are the

focus of the analysis below.

> D.     The Peerless Policy

>    1.      The Insuring Agreement

The insuring clause to Peerless' policy requires Peerless to "pay those sums that the

insured becomes legally obligated to pay as damages because of... 'property damage' to which this insurance applies. [Peerless] will have the right and duty to defend the insured against any 'suit' seeking those damages....  This insurance applies to 'bodily injury' and 'property damage' only if caused by an 'occurrence'...."[63]

Property has suffered "property damage" within the meaning of the insuring clause when it "is altered in appearance, shape, color or in some other material dimension."[64]  For purposes of a CGL policy, covered "property damage" is alleged only when property other than the insured's work product has suffered harm.[65]  Though no minimum level of property damage is necessary to initiate coverage, only property damage that results from an occurrence is covered by the policy.[66] New Hampshire courts have found that faulty or defective workmanship does not qualify as an "occurrence" within the meaning of a CGL policy.[67]  In order to initiate coverage, therefore, there must be allegations of damage to property beyond repair or replacement of the insured's defective work product.

The parties do not dispute that the damage to the original woodwork and the plumbing pipe constitute property damage resulting from an occurrence within the meaning of the policy. They do, however, dispute whether exclusion (j) serves to preclude coverage for these damages.

2.      Business Risk Exclusions

---

[63]Peerless Policy, Section I, Coverage A(1)(a), (b)(1).

[64]Webster, 156 N.H. at 320.

[65]Id. (citing High Country Assocs. V. N.H. Ins. Co., 139 N.H. 39, 43 (1994)).

[66]Id. at 321.

[67]Webster, 156 N.H. at 322.

The standard form CGL policy used by Peerless, and prevalent throughout the industry, contains several provisions "which operate together to exclude the insured's faulty workmanship from coverage."[68]  Exclusions (l) and (m) eliminate coverage for the expense of restoring, repairing, or replacing the insured's defective work and the insured's satisfactory work that suffered damaged due to defective work.[69]

At issue in this case is exclusion (j), which eliminates coverage for certain claims based on damages to the insured's existing property.  Exclusion (j) states in pertinent part that the policy does not apply to damages to:

> (4) Personal property in the care, custody or control of the insured;
>
> (5) That particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [the insured's] behalf are performing operations, if the property damage arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired, or replaced because [the insured's] work was incorrectly performed on it.[70]

Exclusion (j) is the present-day embodiment of what was formerly known as the "care, custody, and control" exclusion.  "Almost all liability policies contain an exclusion for damages to property in an insured's care, custody, or control.  In general, the exclusion applies when an insured is a contractor who has been sued by an owner of property on which work was being performed."[71]  The New Hampshire Supreme Court, however, has yet to examine the operation of exclusion (j).

---

[68] *Couch on Insurance 3d.*, § 129:12.

[69] Id.

[70] Peerless Policy, 24.

[71] Windt, *Insurance Claims & Disputes*, § 11:18.

i.      Exclusion (j)(4)

Some insight can be gained into the operation of exclusion (j)(4) under New Hampshire

law by looking to cases examining its predecessor provision, the "care, custody, and control"

provision.  The New Hampshire Supreme Court has said that whether property damage comes

within the ambit of the "care, custody, and control" provision depends upon the sufficiency of the

evidence that the property was in the possessory, and not merely the proprietary, control of the

insured at the time that it was damaged.[72]  Moreover, this provision does not exclude property

damage from coverage unless the insured exercised exclusive control over the property at the time

of the harm.[73]

The antique doors and wainscoting suffered water damage caused both by excessive

moisture present while stored in the basement by Blackdog during the two years prior to

reinstallation and by excessive moisture present in the installation process in 2004.[74]  The damages

had begun to visibly manifest themselves by December of 2004, at which time Blackdog was still

working on O'Neal's home.[75]

Plaintiff argues that exclusion (j)(4) cannot apply to the damages to the original wainscot

and doors because they were stored in O'Neal's basement and, therefore, Blackdog did not

exercise exclusive control over them.  O'Neal indeed relied on the representation that she could

remain in her home during construction in hiring Blackdog.  But Blackdog informed her just

---

[72]See United States Fidelity & Guar. Co., Inc. v. Johnson Shoes, Inc., 123 N.H. 148, 153
(1983).

[73]Id. at 154.

[74]See Dankens Report.

[75]Motion to Confirm Arbitration Decision, 3.

before demolition began that, if she were to choose to live in her home throughout the project, she would have to do so without the use of running water, electricity, heat, bathrooms, or a kitchen during the renovations.[76]  O'Neal had no real alternative, therefore, but to move elsewhere during construction, leaving her home in the care and possession of Blackdog from February 2002 until September 2004.[77]

Though Blackdog was never given possession of the house to the literal exclusion of O'Neal, Blackdog effectively exercised exclusive possession of the woodworking at all relevant times, since O'Neal could have no genuine presence in her home until after Blackdog improperly reinstalled the woodwork in the summer of 2004.[78]  As David Dankens, the independent professional charged with assessing the damage to the O'Neal project, remarked: "The builder is in control of the site. The builder must insure the existing finish materials stored onsite are protected in a manner that damage will not occur during the construction period."[79] This admonition seems especially appropriate where, as here, the property owner finds herself involuntarily expelled from the construction site.

This court, therefore, finds that exclusion (j)(4) may properly be applied to preclude coverage for the damage to the original doors and wainscoting, as they were in the care, custody, and control of Blackdog both while stored in the basement of the O'Neal home and during the installation process.

---

[76]O'Neal Compl., ¶ 12.

[77]See id. at ¶ 13.

[78]See Motion to Confirm Arbitration Decision, 3.

[79]Dankens Letter to Attorney Murphy and Attorney Consavage., attached as Ex. J to Def.'s Mot. Part. Sum. Judg.

ii.     Exclusion (j)(5)

Exclusion (j)(5) applies to that "particular part of real property on which [the insured] or

any contractors or subcontractors working directly or indirectly on [the insured's] behalf are

performing operations, if the property damage arises out of those operations."  Plaintiff argues

that this exclusion, by its express language, cannot apply to the damage to the doors and

wainscoting because they are goods or fixtures, rather than real property, since the damage

occurred during storage and the installation process, before they were affixed to the house itself.

Defendant does not directly address this argument, but supports its contention that exclusion

(j)(5) applies by relying on the First Circuit's holding in B&T Masonry Construction Company v.

Public Service Mutual Insurance Company that the standard form CGL policy business risk

exclusions preclude coverage for any damages to components of the project itself, which are the

result of the insured's faulty workmanship.[80]

In B & T Masonry, the First Circuit analyzed the operation of exclusions (j)(5) and (j)(6)

under Massachusetts law, in a similar factual context to that at issue here.[81]  Notably,

Massachusetts has largely identical rules of insurance policy construction to those of New

Hampshire.[82]  There, the plaintiff sought a declaration that the defendant's CGL policy provided

coverage for damage to a school building caused by water leakage that was the result of the

plaintiff's earlier faulty workmanship.  The First Circuit found the language of the business risk

---

[80]See B&T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 41 (1st Cir. 2004).

[81]See generally, id.

[82]See, e.g., id. at 39 ("To the extent (if at all) that any ambiguity permeates a policy exclusion, it must be construed strictly against the insurer.").

exclusions to be unambiguous and directly applicable to exclude such damage from coverage, stating that the business risk exclusions "bar coverage as to any damages to the project itself caused by [the insured]'s faulty workmanship".[83]

The First Circuit expressly distinguished damages to any part of the property comprising the insured's project, to which the business risk exclusions would apply to preclude coverage, from damages to adjacent structures or other such unrelated property, for which the CGL policy would indeed provide coverage.[84]  Significantly, the court did not interpret the term "real property" to preclude its application to damages to goods and fixtures, as Plaintiff would have this court do.  Instead, the First Circuit has interpreted this language as delineating a boundary for the exclusion's application between any property on which the insured is in fact conducting operations and any property unrelated to the insured's project that may suffer incidental damage.

Given the substantial identity of New Hampshire and Massachusetts insurance law, this court sees no reason to interpret the scope of exclusion (j) differently under New Hampshire law than the First Circuit has interpreted it under Massachusetts law.  As in B & T Masonry, the property that suffered damage here was part of the project itself, i.e. the woodworking that Blackdog was charged with properly storing and reinstalling in the course of the renovations to Ms. O'Neal's home.  This suggests, therefore, that exclusion (j) precludes coverage for this damage under Peerless's policy.

Plaintiff additionally argues, however, that exclusion (j)(5) is inapplicable because, by the

---

[83]See id. at 41.

[84]Id. ("If, for example, a wall of the school building collapsed due to B&T's negligence and damaged an adjacent structure (not part of the school complex), or if a B&T employee carelessly dropped a trowel and struck a passing vehicle, coverage would attach.").

terms of the exclusion, the property damage must occur while the insured's operations are in

progress and the damage to the woodwork did not arise until after installation.  This argument

cannot succeed.  Though Ms. O'Neal first noticed the visible manifestations of the damage in late

2004, the damage occurred when the woodwork was stored and installed in the presence of

excess moisture.  These events certainly came about during the insured's operations.[85]  In fact,

Plaintiff's first argument against the application of exclusion (j)(5), that the doors and wainscoting

were fixtures and not real property, hinged entirely on the contention that the damage occurred

during storage and installation, before Blackdog had reincorporated the woodworking into the

structure of the house.  Plaintiff cannot have it both ways.

     Accordingly, this court concludes that exclusion (j)(5) operates to exclude the damage to

O'Neal's original doors and wainscoting from coverage under Peerless's policy.

### iii.     Exclusion (j)(6)

     Exclusion (j)(6) applies to "that particular part of any property that must be restored,

repaired, or replaced because [the insured's] work was incorrectly performed on it."  As per the

terms of the policy, exclusion (j)(6) does not exclude from coverage any property damage

included in the "products-completed operations hazard".[86]  The products-completed operations

hazard includes all "property damage occurring away from premises you own or rent and arising

---

[85]See McAllister v. Peerless Ins. Co., 124 N.H. 676, 680 (1984) ("The claims for faulty workmanship as set out in those declarations are claims for defects in existence by the time the work was completed. The evidence of faulty workmanship may well have appeared only after completion, when effluent failed to disperse and grass died. But the claim in each instance before us remains a claim to correct a defect in workmanship. Such a defect is complete when the work is complete....").

[86]Peerless Policy, 26.  The Pollution Exclusion has been inadvertently inserted between Exclusion (j) and its exceptions in the exhibits field by Defendant, but this error is made clear by the CGL form page numbers.

out of 'your product' or 'your work' except: (1) products that are still in your physical possession; or (2) work that has not yet been completed or abandoned."[87]  The New Hampshire Supreme Court has interpreted the "products-completed operations hazard" exception to require that the damage not only manifest itself, but actually occur, after completion of the operations.[88]

Plaintiff cursorily claims that exclusion (j)(6) does not apply because Blackdog had completed its operations on the parts of the premises containing the damaged woodwork before the damage occurred.  As noted in reference to exclusion (j)(5), however, this argument does not get Plaintiff very far.  According to the independent report prepared by David Dankens, the damage to the original doors and wainscoting occurred when Blackdog improperly stored and installed the woodwork in the presence of excess moisture, though it may not have visibly manifested itself until a few months later.

New Hampshire law makes clear that the product-completed operations hazard exception will not serve to reinstate coverage for damage that (j)(6) would otherwise exclude, merely because the damage did not visibly manifest itself until after the insured completed its work.  Rather, the application of this exception turns on when the insured actually inflicted the damage on the property and, here, Blackdog caused the damage to the woodwork while conducting its storage and installation operations.  Exclusion (j)(6), therefore, also applies to preclude coverage for the damage to the original doors and wainscoting.

iv.     Application to the Plumbing Pipe Damage

With regard to the damage to the plumbing pipe, which Ms. O'Neal referenced in her

---

[87]Id. at 37.

[88]McAllister, 124 N.H. at 680.

24

Mass. G.L. c. 93A Demand Letter, Plaintiff has submitted only a conclusory allegation that this indeed constitutes covered property damage sufficient to invoke Defendant's duty to defend Blackdog. But O'Neal has averred that the plumbing line was "cut by Blackdog".  Such damage to a pipe could only have occurred while Blackdog performed operations on the plumbing in the O'Neal home.  Exclusion (j)(5) therefore excludes this damage from coverage as it is damage to a part of real property on which the insured was performing operations and the damage arose out of those operations.[89]  Exclusion (j)(6) additionally operates to exclude this damage from coverage because the pipe constitutes "property that must be restored, repaired, or replaced because [the insured's] work was incorrectly performed on it."[90]

3.      Notice of the Claim and Tender of the Defense

Lastly, Defendant contends that, even if the O'Neal Complaint alleges damages falling within the coverage of its policy,  its duty to defend  never arose because Blackdog failed to either formally tender the defense to Defendant or put Defendant on notice of the O'Neal claim, thereby implicitly tendering the defense, as required by New Hampshire law and the conditions of the policy.[91]

Under New Hampshire law, no duty to defend arises until the insured tenders the defense to the insurer.[92]  In order to tender the defense, however, the insured need only put the insurer on

---

[89]See Peerless Policy, 24.

[90]See id.

[91] See Digman Aff., ¶¶12-16.

[92]White Mountain Cable Constr. Corp. v. Transamerica Ins. Co., 137 N.H. 478, 483 (1993) (citing A. Windt, *Insurance Claims and Disputes* § 4.01, at 128-29 (2d ed. 1988)).

notice of the claim.[93] "The insured having done so, and assuming the claim falls within the terms of the policy, the insurer will have a duty to defend."[94]

The first notice that Defendant received of the O'Neal claim came from Attorney Dowd, Plaintiff's coverage counsel, in October of 2006.[95]  In response to a succession of letters between counsel for Plaintiff and Defendant, Defendant sent a letter to Blackdog's counsel, Attorney Rehnborg, alerting him to the fact that Plaintiff had asked Defendant to share the costs of the O'Neal defense, but that Defendant did not believe any part of the claim invoked coverage under Defendant's policy.[96]  Attorney Rehnborg did not request a defense from Defendant directly, as evidenced by his decision to proceed only against Plaintiff in the declaratory judgment action to establish coverage under Plaintiff's policy.  Nonetheless, Plaintiff argues that the notice of the claim that Plaintiff provided to Defendant sufficed to tender the defense on behalf of Blackdog, even if Defendant never received notice from Blackdog itself.

The plain language of the New Hampshire Supreme Court's holding on this issue suggests that, in order to trigger a duty to defend, notice of the claim must be given to the insurer by the *insured*.[97] But Plaintiff relies on the well-regarded insurance treatise, *Couch on Insurance 3d*, to support its contention that an insurer may tender the defense of a case to another insurer on behalf

---

[93]Id.

[94]Id.

[95]Digman Aff., ¶18.

[96]See Attorney Dunn's Letter to Attorney Rehnborg, dated April 17, 2007, attached as exhibit D to Pl.'s Cross-Mot. Part. Sum. Judg.

[97]See White Mountain, 137 N.H. at 483.

of a co-insured.[98] Significantly, however, the treatise section cited by Plaintiff, when viewed in its entirety, in fact undermines Plaintiff's argument that the notice provided by Plaintiff, another insurer, served to implicitly tender the defense to Defendant.

*Couch on Insurance 3d* presents the general rule "that an insured's duty to defend is ordinarily 'triggered' when the insured, or someone on the insured's behalf, tenders the defense of the action...".[99]  The treatise explicates this general rule through an example, in which an excess insurer owed no duty to defend where the defense was tendered by the attorney for the primary insurer, acting on the attorney's own initiative and with no indication that the attorney was acting on behalf of the insured.[100]

Thus, *Couch on Insurance 3d* expressly distinguishes between a case where the primary insurer tendered the defense to another insurer at the request of the insured and a case, such as this one, where the primary insurer seeks to invoke another insurer's duty to defend for its own benefit.  In a situation where multiple primary insurers are involved:

> "the duty to defend is personal to the insurer and cannot inure to the benefit of another insurer, for the obligation is several, and an insurance carrier is not entitled to divide the duty to defend, nor to require contribution for defending from another carrier, without a specific contractual agreement to that effect."[101]

Under New Hampshire law, therefore, notice of the claim provided by Plaintiff was plainly insufficient to invoke Defendant's duty to defend Blackdog, without some indication that Plaintiff gave such notice on Blackdog's behalf.

---

[98]*Couch on Insurance 3d.* § 200:31 (2007).

[99]Id. at § 200:32.

[100]Id.

[101]Id. at § 200:37.

In the alternative, Plaintiff argues that Blackdog gave notice of the claim to Defendant through Attorney Rehnborg's letter of January 11, 2008, which implored Defendant to participate, directly or indirectly, in the mediation that eventually settled the O'Neal claims as between Plaintiff, Blackdog, and Ms. O'Neal.[102]  Plaintiff contends that this suggestion from the insured's counsel constituted sufficient notice to Defendant to implicitly tender the defense of the O'Neal claim, though the insured never in fact requested that Defendant provide a defense.

The Notice provision in the CGL policy requires that, in the event of a lawsuit against the insured, the insured must notify the insurer "as soon as practicable."[103]  The New Hampshire Supreme Court has interpreted the phrase "as soon as practicable" to mean "as soon as reasonably possible under the circumstances of the case."[104]  Attorney Rehnborg's letter, however, was sent more than one-and-a-half years after Ms. O'Neal initiated the action in Essex County Superior Court and eight months after Ms. O'Neal filed the First Amended Complaint in this court.  And Attorney Rehnborg had already rejected Plaintiff's request that Blackdog add Defendant to the declaratory judgment action in Rockingham County more than a year earlier.[105]  At the very least, as soon as reasonably possible under the circumstances must mean that Blackdog should have provided notice of the claim to Defendant in the course of the declaratory judgment action.  Accordingly, this court cannot reasonably conclude that Blackdog complied with the notice

---

[102]Rehnborg Letter, at 3 ("I would hope that Peerless would also have an interest in participating either directly or indirectly in mediation in an effort to resolve this case and avoid future litigation.").

[103]Digman Aff., 3.

[104]Lumbermens Mut. Casualty Co. v. Oliver, 115 N.H. 141, 143 (1975).

[105]Aff. of Attorney Gordon A. Rehnborg in Support of Def.'s Opp. Pl.'s Cross-Mot. Summ. Judg., ¶ 3.

requirements set forth in the CGL policy.

Because the insured did not provide sufficient notice of the claim to Defendant as soon as reasonably possibly under the circumstances, this court must conclude that Defendant had no duty to defend Blackdog in the O'Neal action.

IV.    Conclusion

Defendant Peerless is entitled to partial summary judgment on the claim that it breached its duty to defend Blackdog because exclusion (j) precludes coverage for all damages alleged in the O'Neal action that potentially occurred during Peerless's coverage period.  Alternatively, were this court to assume that the O'Neal Complaint indeed succeeded in alleging damages for which coverage would attach under the Peerless policy, Peerless's duty to defend never arose because Blackdog failed to notify Peerless of the claim against it as soon as reasonably possible under the circumstances.

Accordingly, Defendant's Motion for Partial Summary Judgment on the Claim that Peerless Breached its Duty to Defend Blackdog [#26] is ALLOWED and Plaintiff's Cross-Motion for Partial Summary Judgment on the Claim that Peerless Breached its Duty to Defend Blackdog [#29] is DENIED.

AN ORDER HAS ISSUED.

       _/s/ Joseph L. Tauro_____
       United States District Judge